UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                Plaintiff,

v.

JAMES E. HUBBELL,

                Defendant.

Case No. **18-CR-078**

---

## **PLEA AGREEMENT**

---

1.      The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Zachary J. Corey, Assistant United States Attorney, and the defendant, James E. Hubbell, individually and by attorney Michael J. Steinle, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### **CHARGES**

2.      The defendant has been charged in a one-count information, which alleges a violation of Title 18, United States Code, Section 371.

3.      The defendant has read and fully understands the charge contained in the information. He fully understands the nature and elements of the crime with which he has been charged, and the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.      The defendant voluntarily agrees to plead guilty to the following count set forth in full in the information, attached hereto as Attachment A.

6.      The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in Attachment A.  The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment B beyond a reasonable doubt.  The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty.  It is not a full recitation of the defendant's knowledge of, or participation in this offense.

## PENALTIES

7.      The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine:  five (5) years and $250,000.  The count also carries a mandatory special assessment of $100 and a maximum of three (3) years of supervised release.  The parties further recognize that a restitution order may be entered by the court.  The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraphs 28 and 29 of this agreement.

8.      The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

9.      The parties understand and agree that in order to sustain the charge of conspiracy to defraud the United States as set forth in the information, the government must prove each of the following propositions beyond a reasonable doubt:

First, that there was a conspiracy to accomplish an illegal objective against the United States;

2

Second, that the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy, *i.e.*, to defraud the United States; and

Third, that at least one of the conspirators committed an overt act in furtherance of the conspiracy.

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth Attachment A. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

3

## Sentencing Guidelines Calculations

14. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## Base Offense Level

16. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in the information is six (6) under Sentencing Guidelines Manual § 2B1.1(a)(2).

## Specific Offense Characteristics

17. The parties acknowledge and understand that the government will recommend to the sentencing court that a 28-level increase for a loss exceeding $250,000,000 under Sentencing Guidelines Manual § 2B1.1(b)(1)(O) is applicable to the offense level for the offense charged in the information. The parties acknowledge and understand that the defendant will not join in this recommendation.

## Obstruction

18.     Pursuant to Sentencing Guidelines Manual § 3C1.1, the parties acknowledge and understand that the government will take no position on whether a two-level increase should be given for obstruction of justice; however, the government will advise the sentencing court with regard to any facts or law relevant to this adjustment.

## Acceptance of Responsibility

19.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.  In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

20.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.     Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the fine to be imposed; the amount of restitution and the terms and condition of its payment; the length of supervised release and the terms and conditions of the release; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

5

22.     The parties understand and agree that, if the sentencing court accepts the government's recommendation as to the 28-level increase applicable to the offense level for the loss amount as specified above, the government will recommend a sentence below the applicable sentencing guideline range in order to account for the defendant's role in, and lesser financial gain from, the conspiracy relative to the other conspirators and relative to the loss amount.

## Court's Determinations at Sentencing

23.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in

6

the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 45 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form. The defendant further agrees, upon request of FLU whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest and cooperate in the liquidation of any such assets.

### Special Assessment

27.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

### Restitution

28.     The parties acknowledge and understand that if the defendant agrees to pay the government an amount that resolves any civil liability he has related to this matter, including any civil liability under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, the government will recommend to the sentencing court that payment of such amount be deemed to discharge the defendant's obligation to pay restitution. If the defendant does not reach such an agreement, the government will recommend to the sentencing court that restitution be ordered and that it be apportioned among conspirators to reflect the level of contribution to the victim's loss and economic circumstances of each conspirator pursuant to Title 18, United States Code, Section 3664(h).

29.     The defendant agrees to pay restitution as ordered by the sentencing court. The defendant agrees to cooperate in efforts to collect any restitution obligation. The defendant

understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## DEFENDANT'S COOPERATION

30.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so.  The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation.  The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from the applicable sentencing guideline range.  The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

31.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

      a.      If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

      b.      If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government

8

establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.  At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.  At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

32.  The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

33.  The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

34.  The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth

9

Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

35.     The defendant knowingly and voluntarily waives any claim or objection he may have based on statute of limitations.

### Further Civil or Administrative Action

36.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

37.     The defendant agrees to make good faith efforts to cooperate with the United States in promptly resolving any civil liability he has related to this matter, including any civil liability under the False Claims Act, 31 U.S.C. § 3729 *et seq.* Such cooperation shall include (a) submitting a complete and sworn financial statement on forms provided by the United States and any documentation required by the forms; and (b) identifying assets in which the defendant has an interest and cooperating in the satisfaction of any liability to the extent called for by any future agreement reached by the parties.

38.     The defendant further agrees not to contest or dispute any action by any federal agency to suspend or debar the defendant from government contracting to the extent such action is related to or arises out of this case.

## GENERAL MATTERS

39.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

40.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

41.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

42.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

43.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government.  If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to file any and all charges which were not filed because of this agreement.  The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement.  The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.  If the defendant and his attorney have

11

signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

44.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty.  The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

**ACKNOWLEDGMENTS**

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 4/10/18

JAMES E. HUBBELL
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 4-10-18

MICHAEL J. STEINLE
Attorney for Defendant

For the United States of America:

Date: 4/11/2018

MATTHEW D. KRUEGER
United States Attorney

Date: 4/11/2018

ZACHARY J. COREY
Assistant United States Attorney

13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                           Case No.

JAMES E. HUBBELL,                             Title 18, United States Code, Section 371

Defendant.

## INFORMATION

**THE UNITED STATES ATTORNEY CHARGES:**

1.     Beginning in approximately June 2004, and continuing through August 2016, in the State and Eastern District of Wisconsin and elsewhere,

**JAMES E. HUBBELL**

knowingly conspired with other persons and entities known and unknown, to participate in a scheme to defraud the United States by using deceitful and dishonest means to impair, impede, and defeat the lawful function of its agencies in the implementation, execution, and administration of programs to help small businesses obtain federal procurement contracts.

### <u>Background – Small Business Programs for Government Contracting</u>

1.     Each year, federal agencies award contracts to purchase goods and services. Some federal contracts are set aside to be awarded only to small businesses that are certified as meeting eligibility criteria relating to their size and status.

2.     Two programs that certify small businesses for government contracting are the following:

a. The United States Small Business Administration's ("SBA") 8(a) Business Development Program ("8(a) Program") helps small businesses that are owned by socially and economically disadvantaged individuals. A firm certified through the 8(a) Program as a Small Disadvantaged Business is eligible to receive federal procurement contracts that are set aside for Small Disadvantaged Businesses.

b. The United States Department of Veterans Affairs' ("VA") Service-Disabled Veteran Owned Small Business ("SDVOSB") Program helps small businesses that are owned by service-disabled veterans. A qualified SDVOSB is eligible to receive federal procurement contracts that are set aside for such businesses. The VA's Center for Veteran Enterprises ("CVE") is responsible for verifying whether a firm qualifies as a SDVOSB.

3. The small business programs described above share certain eligibility criteria that a firm must meet, including the following:

a. Size: The firm must be small according to SBA size standards and specified levels of average annual gross receipts;

b. Ownership: The firm must be at least 51% percent owned by a socially and economically disadvantaged individual in the case of the 8(a) Program or by a service-disabled veteran in the case of the SDVOSB Program; and

c. Control: The disadvantaged owner or service-disabled veteran owner must control the firm. Control includes both day-to-day management and long-term decision-making authority. Factors relevant to control include whether the disadvantaged owner or service-disabled veteran owner: (i) has the experience necessary to control the firm; (ii) has ultimate managerial control over others; (iii) receives higher compensation from the firm than others receive; and (iv) is dependent upon others for critical support, such as financing and bonding.

4. To become certified under these small business programs, a firm must submit an application and supporting documentation to the certifying agency to show that it meets the eligibility criteria. Likewise, to maintain a certification, a firm must make periodic submissions confirming that it continues to meet the eligibility criteria.

5. Any firm seeking a contract with the federal government must register in an online database maintained by the United States General Services Administration ("GSA") and make specific representations regarding the firm, including the firm's qualifications for small business programs. The firm must renew those representations each year and attest to their

2

accuracy under the penalty of perjury.

6.     In addition, to be eligible for VA contracts set aside for SDVOSBs, a firm must be listed on the VA's Vendor Information Pages online database as meeting the SDVOSB Program requirements.

7.     Contracting officials for federal agencies rely upon these certifications in the GSA database and the VA's Vendor Information Pages in determining whether a firm is eligible to receive a set-aside contract.

### Background – Roles of Persons and Entities Involved in the Conspiracy

At all times material to this information:

8.     Brian L. Ganos was the sole owner and president of Sonag Company, Inc. ("Sonag Company"), a Wisconsin corporation that performed construction work. Sonag Company operated out of a building on Florist Avenue in Milwaukee, Wisconsin ("the Florist Avenue building.").

9.     James E. Hubbell worked for companies affiliated with Ganos and supervised their construction operations. From 2006 through approximately 2012, Hubbell purported to be the 49% owner and Vice President of C3T, Inc. ("C3T").

10.     C3T was a Wisconsin corporation that performed construction work. C3T's office was located in the Florist Avenue building. C3T was certified under the VA's SDVOSB program from 2006 to at least 2016, except for certain periods.

11.     T.A. was a service-disabled veteran who, from 2006 through 2012, purported to be the 51% owner and president of C3T. In approximately December 2012, T.A. acquired Hubbell's shares of C3T and purported to be the 100% owner of C3T. For long stretches from 2006 through 2012, T.A. had virtually no involvement in C3T. Subsequently, T.A. became more involved in C3T, but Ganos, Hubbell, and others retained authority over key aspects of C3T.

3

12.     J.L. was a Hispanic-American and Minnesota resident who purported to be the 85% owner and president of Nuvo Construction Company, Inc. ("Nuvo").  From June 2004 forward, J.L. worked full-time on construction projects for Southwest Minnesota Housing Partnership ("SWMHP"), which is located in Slayton, Minnesota.

13.     Nuvo was a Wisconsin corporation that performed construction work and purported to provide ready-mix concrete.  Nuvo's office was located in the Florist Avenue building.  As noted, J.L. was Nuvo's nominal president and 85% owner.  Ganos purported to own only 15% of Nuvo and to serve only as its vice president.  Nuvo was certified by the SBA under the 8(a) Program as a Small Disadvantaged Business from 2004 until it graduated from the 8(a) Program in 2013.

14.     Pagasa was a Wisconsin corporation purportedly owned by O.M., an Asian-Pacific American female.  O.M. was a project manager for C3T from 2009 to approximately 2016, working in the Florist Avenue building.  With the assistance of Ganos, Hubbell, and others, O.M. formed Pagasa in 2012 and obtained certification from the SBA under the 8(a) Program for Pagasa in September 2015.

## Manner and Means of the Conspiracy

The manner and means by which the conspiracy and scheme to defraud were sought to be accomplished included, among others, the following:

15.     Ganos, Hubbell, and others controlled and operated the following companies that had straw owners:

    a.     Nuvo, with straw owner J.L., who qualified as socially and economically disadvantaged;

    b.     C3T, with straw owner T.A., who qualified as a service-disabled veteran; and

    c.     Pagasa, with straw owner O.M., who qualified as socially and economically disadvantaged.

4

16. The straw owners did not have the benefits or burdens of ownership, nor did they have actual control of the companies. Instead, Ganos, Hubbell, and others exercised control over key aspects of the companies, including long-term strategic decisions, finances, bonding, personnel, compensation, and day-to-day operations.

17. Ganos, Hubbell, and others made arrangements to provide the companies with critical support, including start-up financing, bonding, equipment, space in the Florist Avenue building, management, personnel, and accounting services.

18. Ganos, Hubbell, and others submitted and caused to be submitted applications and subsequent submissions to the small business programs to obtain and maintain the following small business certifications for the companies:

   a. In June 2004, Nuvo's application to the 8(a) Program was submitted to the SBA. Subsequently, Ganos and others caused Nuvo's 8(a) annual updates to be submitted to the SBA until Nuvo graduated from the 8(a) Program in 2013.

   b. In April 2006, C3T began holding itself out as an SDVOSB. Subsequently, Ganos, Hubbell, and others caused the submission of an application to the CVE to verify C3T as an SDVOSB, as well as later submissions claiming C3T's eligibility to be reverified as an SDVOSB. These included submissions to the CVE for reverification in July 2015.

   c. In February 2015, Pagasa's application to the SBA's 8(a) Program was submitted. Subsequent submissions to SBA were made to maintain Pagasa's 8(a) certification.

19. The applications and subsequent submissions to the small business programs to obtain and maintain the small business certifications contained materially false representations, including the following:

   a. False representations that the companies met the eligibility criteria for the programs;

   b. False representations that the straw owners devoted the requisite efforts to managing the companies;

5

c.      False representations that the straw owners had ultimate control over others involved in the companies;

d.      False representations regarding the straw owners' compensation from the companies in relation to the compensation received by others;

e.      False representations regarding the companies' reliance on others for critical support, such as start-up financing and bonding; and

f.      False representations regarding the companies' affiliation with each other and with Ganos and Sonag Company.

20.      Ganos, Hubbell, and others caused Nuvo, C3T, and Pagasa to submit their registration and annual representations and certifications in GSA databases. These submissions falsely represented that the companies met the respective small business programs' eligibility criteria.

21.      Steps were taken to create and maintain the false appearance that the companies satisfied the small business programs' eligibility criteria. Such steps included:

a.      Preparing J.L. and T.A. for interviews with small business program representatives so they could appear to be actively managing Nuvo and C3T;

b.      Arranging for others routinely to execute contracts, checks, and other documents in J.L.'s and T.A.'s name; and

c.      Giving others access to J.L.'s and T.A.'s email accounts so that emails could be sent and received in their names.

22.      Ganos and others directed bookkeeping, accounting, and payroll procedures and transactions that facilitated and concealed the scheme, including the following:

a.      Arranging for J.L.'s compensation from SWMHP to be paid through Nuvo's payroll; and

b.      Creating false records to make it appear that T.A. had received additional income that would make him the highest compensated C3T employee, even though he had not received the income.

23.      Ganos, Hubbell, and others used, and caused to be used, the fraudulently obtained small business certifications to win numerous federal construction contracts set aside for Small

6

Disadvantaged Businesses or SDVOSBs.

24.    The fraudulently obtained federal set-aside contracts were performed by various combinations of employees, equipment, and resources of Sonag Company, Nuvo, C3T, and Pagasa.

25.    Throughout the conspiracy, Nuvo and C3T used interstate wires to submit numerous claims for payments on federal construction contracts set aside for Small Disadvantaged Businesses or SDVOSBs.

26.    In the course of the conspiracy, Nuvo and C3T received millions of dollars in payments for set-aside contracts to which Nuvo and C3T were not entitled because they did not actually meet the small business program eligibility requirements.  The payments generally were transmitted to Nuvo and C3T by means of interstate wires.

27.    The defendants shared in the proceeds of the conspiracy and scheme to varying extents with Ganos, Hubbell, and others drawing significantly more monies than the straw owners.

28.    On multiple occasions throughout the conspiracy, the conspirators engaged in efforts to conceal the scheme and to obstruct investigations by small business program representatives and criminal investigators.  Those efforts included the following:

    a.    In 2012, the VA Office of Inspector General and the Federal Bureau of
          Investigation conducted a criminal investigation into, among other things, C3T's
          eligibility for SDVOSB status.  Criminal investigators interviewed Hubbell and
          T.A. together on or about June 12, 2012.  Hubbell and T.A. made materially false
          statements to the investigators, denying that C3T had any affiliation with Nuvo or
          Sonag Company.

    b.    In November 2012, the CVE denied C3T's request for reverification in the
          SDVOSB Program because, among other reasons, it appeared that Hubbell
          exercised control over T.A.  In approximately January 2013, Ganos, Hubbell,
          T.A., and others submitted, and caused to be submitted, a request to the CVE to
          reverify C3T as an SDVOSB.  The request falsely represented that Hubbell had
          resigned and that T.A. had assumed full control of Hubbell's duties.  The request

7

omitted the material fact that Hubbell was being paid by Pagasa and continued to manage C3T projects actively from an office located adjacent to C3T's office. As a result, the CVE reverified C3T as an SDVOSB.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its objects, in addition to the actions described in paragraphs 15 to 28 of this Information, the following overt acts were committed in the Eastern District of Wisconsin and elsewhere:

29.     On or about May 30, 2013, by which time the conspirators had represented to the CVE that Hubbell had left C3T, Hubbell used his personal email address to send an email to C3T employees with instructions to attend a meeting for project managers.

30.     On or about July 15, 2015, T.A. underwent a site examination by the CVE to determine if C3T was eligible for reverification as an SDVOSB. T.A. gave materially false statements to the examiner, including that T.A. controlled all aspects of C3T operations, that T.A. made all business decisions, and that C3T had no business relationship or association with Ganos or Sonag Company.

All in violation of Title 18, United States Code, Section 371.

_____
MATTHEW D. KRUEGER
United States Attorney
Date: _____

8

## Attachment B

1.      Beginning in approximately June 2004, and continuing through August 2016 in the State and Eastern District of Wisconsin and elsewhere, James E. Hubbell knowingly conspired with other persons and entities known and unknown, to participate in a scheme to defraud the United States by using deceitful and dishonest means to impair, impede, and defeat the lawful function of its agencies in the implementation, execution, and administration of programs to help small businesses obtain federal procurement contracts.

### Background

2.      Each year, federal agencies award contracts to purchase goods and services. Some federal contracts are set aside to be awarded only to small businesses that are certified as meeting eligibility criteria relating to their size and status.

3.      Two programs that certify small businesses for government contracting are the following:

    a.      The United States Small Business Administration's ("SBA") 8(a) Business Development Program ("8(a) Program") helps small businesses that are owned by socially and economically disadvantaged individuals. A firm certified through the 8(a) Program as a Small Disadvantaged Business is eligible to receive federal procurement contracts that are set aside for Small Disadvantaged Businesses.

    b.      The United States Department of Veterans Affairs' ("VA") Service-Disabled Veteran Owned Small Business ("SDVOSB") Program helps small businesses that are owned by service-disabled veterans. A qualified SDVOSB is eligible to receive federal procurement contracts that are set aside for such businesses. The VA's Center for Veteran Enterprises ("CVE") is responsible for verifying whether a firm qualifies as a SDVOSB.

4.      The small business programs described above share certain eligibility criteria that a firm must meet, including the following:

    a.      Size: The firm must be small according to SBA size standards and specified levels of average annual gross receipts;

    b.      Ownership: The firm must be at least 51% percent owned by a socially and economically disadvantaged individual in the case of the 8(a) Program or by a service-disabled veteran in the case of the SDVOSB Program; and

    c.      Control: The disadvantaged owner or service-disabled veteran owner must control the firm. Control includes both day-to-day management and long-term decision-making authority. Factors relevant to control include whether the disadvantaged owner or service-disabled veteran owner: (i) has the experience necessary to control the firm; (ii) has ultimate managerial control over others; (iii) receives higher compensation from the firm than others receive; and (iv) is

dependent upon others for critical support, such as financing and bonding.

5.     To become certified under these small business programs, a firm must submit an application and supporting documentation to the certifying agency to show that it meets the eligibility criteria. Likewise, to maintain a certification, a firm must make periodic submissions confirming that it continues to meet the eligibility criteria.

6.     Any firm seeking a contract with the federal government must register in an online database maintained by the United States General Services Administration ("GSA") and make specific representations regarding the firm, including the firm's qualifications for small business programs. The firm must renew those representations each year and attest to their accuracy under the penalty of perjury.

7.     In addition, to be eligible for VA contracts set aside for SDVOSBs, a firm must be listed on the VA's Vendor Information Pages online database as meeting the SDVOSB Program requirements.

8.     Contracting officials for federal agencies rely upon these certifications in the GSA database and the VA's Vendor Information Pages in determining whether a firm is eligible to receive a set-aside contract.

9.     Brian L. Ganos was the sole owner and president of Sonag Company, Inc. ("Sonag Company"), a Wisconsin corporation that performed construction work. Sonag Company operated out of a building on Florist Avenue in Milwaukee ("the Florist Avenue building").

10.     James E. Hubbell worked for companies affiliated with Ganos and supervised their construction operations. From 2006 through approximately 2012, Hubbell purported to be the 49% owner and Vice President of C3T, Inc. ("C3T").

11.     C3T was a Wisconsin corporation that performed construction work. C3T's office was located in the Florist Avenue building. C3T was certified under the VA's SDVOSB program from 2006 to at least 2016, except for certain periods.

12.     T.A. was a service-disabled veteran who, from 2006 through 2012, purported to be the 51% owner and president of C3T. In approximately December 2012, T.A. acquired Hubbell's shares of C3T and purported to be the 100% owner of C3T. For long stretches from 2006 through 2012, T.A. had virtually no involvement in C3T. Subsequently, T.A. became more involved in C3T, but Ganos, Hubbell, and others retained authority over key aspects of C3T.

13.     J.L. was a Hispanic-American and Minnesota resident who purported to be the 85% owner and president of Nuvo Construction Company, Inc. ("Nuvo"). From June 2004 forward, J.L. worked full-time on construction projects for Southwest Minnesota Housing Partnership ("SWMHP"), which is located in Slayton, Minnesota.

14.     Nuvo was a Wisconsin corporation that performed construction work and purported to provide ready-mix concrete. Nuvo's office was located in the Florist Avenue

2

building. As noted, J.L. was Nuvo's nominal president and 85% owner. Ganos purported to own only 15% of Nuvo and to serve only as its vice president. Nuvo was certified by the SBA under the 8(a) Program as a Small Disadvantaged Business from 2004 until it graduated from the 8(a) Program in 2013.

15. Pagasa was a Wisconsin corporation purportedly owned by O.M., an Asian-Pacific American female. O.M. was a project manager for C3T from 2009 to approximately 2016, working in the Florist Avenue building. With the assistance of Ganos, Hubbell, and others, O.M. formed Pagasa and obtained certification from the SBA under the 8(a) Program for Pagasa in September 2015.

**Conspiracy to Defraud the United States**

16. Ganos, Hubbell, and other co-conspirators operated companies with straw owners who qualified as a socially and economically disadvantaged individual or as a service-disabled veteran, but who did not actually control the companies. The conspirators fraudulently obtained government certifications as to the status of the companies based upon the straw owners. Based on those fraudulently obtained certifications, the companies obtained federal set-aside contract payments to which they were not entitled.

Nuvo Construction Company, Inc.

17. Ganos's company—Sonag Company—performed construction work as a Small Disadvantaged Business certified in the 8(a) Program from 1994 to 2003. Hubbell supervised construction operations for Sonag Company and reported to Ganos. J.L. was a lower-level employee of Sonag Company and reported to Hubbell.

18. In approximately 2001, as Ganos anticipated Sonag Company's graduation from the 8(a) Program, Ganos and J.L. agreed to work together to operate a company that would seek certification in the 8(a) Program. J.L. qualified as a socially and economically disadvantaged person for purposes of the 8(a) Program.

19. Thereafter in 2001, J.L. changed the name of a business he owned to Nuvo, and transferred 15% ownership to Ganos for approximately $5,000, leaving J.L. with 85% ownership. For several years, J.L. attempted to operate Nuvo in Milwaukee with assistance from Ganos and Sonag Company.

20. On or about June 9, 2004, Ganos, J.L., and others submitted and caused to be submitted Nuvo's application to the SBA to be certified under the 8(a) Program. The application stated that J.L. devoted 100% of his time to managing Nuvo, and that Ganos devoted 0% of his time to managing Nuvo. The application also stated that Ganos was not socially and economically disadvantaged for purposes of the application, and that Ganos did not receive higher compensation than J.L., nor provide financial or bonding support, office space, or equipment to Nuvo.

21. Just a few days before Nuvo's 8(a) application was submitted, in June 2004, J.L. accepted an offer to begin full-time employment as a Senior Project Manager for SWMHP in

3

Slayton, Minnesota. Around that time, J.L. moved to Minnesota and began working full time for SWMHP. Ganos and J.L. did not disclose this to the SBA in Nuvo's 8(a) application.

22. On or about September 23, 2004, the SBA certified Nuvo as a Small Disadvantaged Business based upon those representations. Soon thereafter, in October 2004, Ganos and others submitted a Nuvo business plan, which upon the SBA's approval allowed Nuvo to bid on 8(a) set-aside contracts. The business plan listed J.L. as having an annual salary of $48,000 per year, and listed Ganos as receiving no annual salary at all. The business plan did not disclose that J.L. was working full-time in Minnesota for SWMHP.

23. Thereafter, from 2005 to 2012, Ganos and others submitted and caused to be submitted Nuvo's 8(a) annual updates to maintain Nuvo's 8(a) certification. These annual updates fraudulently represented that J.L. was Nuvo's full-time, day-to-day manager and that Ganos received no compensation from Nuvo.

24. From 2005 through 2012, Ganos and others caused Nuvo to register in GSA databases and complete annual representations in those databases in order to seek federal contracts. These submissions in the GSA databases falsely represented that Nuvo qualified for certification under the 8(a) Program.

25. In 2005, at Ganos's direction, J.L. submitted a letter to SWMHP that purported to resign his employment with SWMHP. J.L. nonetheless continued to work full time on projects for SWMHP through 2016. J.L. arranged for his compensation from SWMHP to be paid to Nuvo, and Nuvo then paid J.L. that same compensation through Nuvo's payroll system. J.L.'s compensation from SWMHP paid through Nuvo grew from $50,000 in 2005 to approximately $100,000 in 2016.

26. From 2004 through 2016, J.L. also received an additional, annual salary from Nuvo, apart from the SWMHP compensation. These payments ranged from approximately $48,000 up to approximately $72,000 by 2015. During those years, multiple Nuvo employees earned more income from Nuvo. In some years, J.L. also received modest bonuses.

27. From mid-2004 through 2016, J.L. had little involvement in Nuvo. J.L. did not have the benefits or burdens of ownership, nor did he have actual control of Nuvo.

28. Instead, Ganos, Hubbell, and others exercised control over key aspects of Nuvo, including long-term strategic decisions, finances, bonding, personnel, compensation, and day-to-day operations. Nor did Nuvo operate independently of other Ganos-controlled companies. Instead, Nuvo's operations, bonding, and finances were entwined with the other the companies, including Sonag Company.

29. As Hubbell knew, Ganos and others exercised control over Nuvo's bonding, which was essential to obtaining federal set-aside contracts. Ganos arranged for Nuvo to obtain bonding through an agent and personal friend, T.C., who provided bonding for Sonag Company and C3T. Nuvo's bonding was based upon guarantees by Sonag Company and Ganos personally, as well as financial statements that reported the consolidated finances of Sonag Company, Nuvo, and C3T.

4

30.     As Hubbell knew, Ganos and others exercised control over Nuvo's finances. Ganos determined J.L.'s and other Nuvo employees' compensation. When Nuvo began generating profits, at Ganos's direction, substantial amounts of money were transferred from Nuvo to companies Ganos controlled, including Sonag Company.

31.     Ganos, Hubell, and others took steps to create and maintain the false appearance that Nuvo satisfied the small business programs' eligibility criteria. Such steps included preparing J.L. for meetings with small business program representatives so that he could appear to have been managing the company; arranging for others routinely to execute contracts, checks, and other documents in J.L.'s name; and giving others access to J.L.'s email accounts so that emails could be sent and received in their names.

32.     Ganos, Hubbell, and others used, and caused to be used, Nuvo's 8(a) Program certification to obtain numerous federal construction contracts that were set aside for Small Disadvantaged Businesses.

33.     Under Ganos's and Hubbell's supervision, the fraudulently obtained federal 8(a) set-aside contracts and concrete purchase orders were performed by various combinations of employees, equipment, and resources of companies that Ganos controlled, including Sonag Company and C3T.

34.     From 2004 through 2016, Nuvo received millions of dollars in payments for 8(a) set-aside contracts to which Nuvo was not entitled because Nuvo did not actually meet the 8(a) Program eligibility requirements. Many of the payments were transmitted to Nuvo by means of interstate wires.

C3T, Inc.

35.     In approximately April 2006, Ganos, Hubbell, and T.A. established C3T. Ganos transferred 51% of the stock in an inactive company he owned to T.A., and 49% of the stock to Hubbell. T.A. and Hubbell did not pay Ganos any consideration for stock. They changed the entity's name to C3T. Ganos, Hubbell, and T.A. arranged for T.A. to be named the majority owner and president of C3T because he qualified as a service-disabled veteran. T.A. had relatively little training or experience in construction management.

36.     To begin operations, C3T depended heavily on Ganos-controlled companies. C3T was given space in the Florist Avenue building. Certain of Ganos's employees, including Hubbell and bookkeeper L.M., performed services for C3T. C3T used Sonag Company's and Nuvo's equipment for projects.

37.     T.A. did not have the benefits or burdens of ownership, nor did he have actual control of C3T. Instead, Ganos, Hubbell, and others exercised control over key aspects of C3T, including long-term strategic decisions and day-to-day operations and management. For long periods after C3T's formation until 2012, T.A. had very little involvement with C3T and rarely appeared at its office.

5

38.     Even after 2012, when T.A. attempted to exercise some control over C3T, his authority remained subservient to Ganos, Hubbell, and others. For example, when T.A. attempted to limit a C3T employee's reimbursement for automobile expenses, Hubbell reinstated the reimbursement.

39.     As Hubbell knew, Ganos exercised control over C3T's bonding, which was essential to obtaining federal set-aside contracts. Ganos arranged for C3T to obtain bonding through an agent and personal friend, T.C., who provided bonding for Sonag Company and Nuvo. C3T's bonding was based upon guarantees by Sonag Company and Ganos personally, as well as financial statements that reported the consolidated finances of Sonag Company, Nuvo, and C3T.

40.     As Hubbell knew, Ganos and others exercised control over C3T's finances. Ganos and Hubbell determined T.A.'s compensation, which he received even during periods when he had little involvement with C3T. Throughout the conspiracy, T.A. rarely received accurate financial reports or made significant decisions about C3T's finances. When C3T began generating profits, at Ganos's direction, substantial amounts of money were transferred from C3T to companies he controlled, including Sonag Company, Pagasa, and Trinity Marketing Services, Inc.

41.     In April 2006, Ganos and Hubbell caused C3T to be registered in the GSA database for government contractors and claim to be certified that C3T was a SDVOSB. Thereafter, annually from April 2007 through April 2016, the conspirators submitted, and caused to be submitted, C3T's representations and certifications in GSA databases. These submissions falsely represented that C3T met the SDVOSB Program's eligibility criteria.

42.     In or around August 2008, the conspirators submitted, and caused to be submitted, C3T's application to be verified as a SDVOSB. The application falsely represented that T.A. controlled C3T. On August 20, 2008, the CVE verified C3T as an SDVOSB and added C3T to the VA's Vendor Information Pages online database.

43.     The CVE conducted a site visit in May 2012 to determine if C3T met the eligibility to be an SDVOSB. Hubbell and T.A. made false statements to the CVE examiner to make it appear that T.A. controlled C3T. For example, the conspirators knew that one issue of inquiry would be whether T.A. was C3T's highest compensated employee, which he was not. To deceive the CVE, false records were created to make it appear that T.A. had received $50,000 in additional compensation outside of C3T's payroll system, but T.A. did not actually receive those funds.

44.     On or about June 12, 2012, special agents with the VA Office of Inspector General and the Federal Bureau of Investigation interviewed T.A. and Hubbell as part of a criminal investigation into allegations regarding C3T's eligibility for the SDVOSB Program. T.A. and Hubbell made materially false statements in the interview, including that C3T had no affiliation with Nuvo or Sonag Company.

45.     In late 2012, the CVE denied C3T's request to be reverified because it could not conclude that T.A. exercised control over Hubbell. The conspirators subsequently took steps to

6

make it appear that Hubbell departed C3T. C3T funds were paid to Hubbell, ostensibly to purchase his 49% stake in C3T and give T.A. 100% of the shares. Hubbell moved out of C3T's office space into another office in the Florist Avenue building.

46.     Nonetheless, Hubbell continued to supervise certain C3T projects, and C3T employees continued to consult him. Hubbell's new office was adjacent to, and easily accessible from, C3T's office space. Hubbell's compensation was moved from C3T's payroll to Pagasa's payroll, which was often funded by transfers from C3T. In 2015, Hubbell's compensation was moved back to C3T.

47.     On or about January 8, 2013, T.A. submitted, and caused to be submitted, another request to the CVE to reverify C3T as a SDVOSB. The request contained materially false and fraudulent representations regarding C3T's eligibility for SDVOSB status. For example, it represented that T.A. had fully assumed Hubbell's responsibilities. Based upon this fraudulent submission, the CVE reverified C3T as an SDVOSB in February 2013.

48.     In reality, Hubbell continued to work on C3T projects while being paid by Pagasa. To avoid the appearance doing so, Hubbell used his personal email address, rather than his C3T email address, to communicate with C3T employees. For example, on or about May 30, 2013, Hubbell used his personal email address to send an email to C3T employees with instructions to attend a meeting for project managers.

49.     On or about July 15, 2015, T.A. underwent a site examination by the CVE to determine if C3T was eligible for reverification as an SDVOSB. T.A. gave materially false statements to the examiner, including that T.A. controlled all aspects of C3T operations, that T.A. made all business decisions, and that C3T had no business relationship or association with Ganos or Sonag Company.

50.     During the conspiracy, C3T received over 100 federal contracts based upon its fraudulently obtained SDVOSB verification. From 2006 through at least June 2016, the conspirators submitted, and caused to be submitted, numerous claims to the VA for payments to C3T on SDVOSB set-aside contracts. As a result, C3T received millions of dollars in payments on SDVOSB set-aside contracts for which C3T was not eligible.

Pagasa Construction Co., Inc.

51.     Ganos, Hubbell, and others also conspired to support another company, Pagasa, as a vehicle to obtain 8(a) Program certification and set-aside contracts as Nuvo approached graduation from the 8(a) Program.

52.     In consultation with Hubbell and others, in 2012, O.M. formed Pagasa. O.M., an Asian-Pacific female, qualified as socially and economically disadvantaged for the 8(a) Program.

53.     Pagasa received start-up funding from C3T and Nuvo, including $5,000 to open Pagasa's bank account. O.M. had no capital of her own to invest in the company. At Ganos's and Hubbell's direction, L.M. handled Pagasa's bookkeeping and managed its cash flow. Pagasa also received additional periodic deposits from C3T and Nuvo even when Pagasa had not

7

performed any services for C3T or Nuvo.

54.     Ganos, Hubbell, and L.M. also agreed to give Pagasa other support. Pagasa's email and computers set up by Sonag Company's IT person. L.M. registered Pagasa on GSA databases. Ganos arranged to secure bonding for Pagasa through T.C., with a general indemnity agreement signed by Ganos for Sonag Company, Nuvo, and C3T.

55.     O.M. continued to work as a project manager for C3T during 2013 and 2014, even as she purported to be the full-time manager of Pagasa. In order to build a work history for Pagasa, Hubbell arranged small private contracts in Pagasa's name and used C3T's labor to complete them. O.M. had little control over the decisions to bid for and perform those contracts.

56.     L.M. and Hubbell helped O.M. prepare and submit to the SBA Pagasa's initial application to the 8(a) Program in February 2015 and Pagasa's business plan in October 2015. These submissions contained false statements, including that Pagasa's initial funding came from O.M.; that O.M. worked full-time for Pagasa and had ultimate decision-making authority; and that Pagasa performed certain projects that were actually performed by C3T. Pagasa's work history listed a $140,000 remodeling project of Hubbell's home, even though the work was actually done by a different contractor. The application falsely stated that Pagasa had no affiliation with C3T.

57.     Based on those false representations, the SBA certified Pagasa as an 8(a) company, although Pagasa did not obtain any federal contracts based upon its 8(a) status. After search warrants were executed related to this case, O.M. voluntarily withdrew Pagasa from the 8(a) program.

Proceeds from the Conspiracy

58.     The conspirators shared in the proceeds of the conspiracy and scheme to varying extents.

59.     As Hubbell knew, Ganos directed that Nuvo funds be used to pay significant personnel expenses for Ganos. Hubbell also knew that Ganos shifted significant funds from C3T and Nuvo during the conspiracy to companies that Ganos controlled, including Sonag Company.

60.     With Ganos's approval, Hubbell received significantly more monies during the conspiracy than the straw owners J.L. and T.A. To avoid the appearance of being more highly compensated than the straw owners, Ganos and Hubbell arranged for Hubbell to receive some of his compensation by C3T paying personnel expenses for Hubbell, such as payments of Hubbell's personal credit card.

8